UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LINDA CONWAY, et al.,           )
                                )
                Plaintiffs,     )
                                )
        v.                      )        No.   4:04CV569 FRB
                                )
RONALD BATTELLE, et al.,        )
                                )
                Defendants.     )

### MEMORANDUM AND ORDER

Presently pending before the Court is defendants' Joint Motion for Summary Judgment (filed July 29, 2005/Docket No. 24). All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

This case arises out of a sequence of events occurring on May 12, 2003, that tragically resulted in the death of Jonathan Conway. Plaintiffs Linda Conway and Davis Michael Conway, Jonathan's parents, bring this cause of action alleging that the conduct of various St. Louis County Police Officers, as well as the members of the Board of Police Commissioners, caused Jonathan's death and violated various of their rights as protected by state and federal law. Defendants are Ronald A. Battelle, Superintendent of Police, St. Louis County Police; Mary Barton, Lieutenant, St. Louis County Police; Jeffery Burk and Scott Johnston, Sergeants, St. Louis County Police; Stephen Trentham, Stephen Nagle and

Richard Muehlenbeck, Officers, St. Louis County Police; and Ronald Flagg, Sheila M. Hoffmeister, Patrick A. Twardowski, Gene A. Warmann, and Leon Burke, Members of the Board of Police Commissioners (collectively, "Board"). All defendants are sued in their personal and official capacities.

## I. Factual Allegations of the Complaint

In their Complaint, plaintiffs allege that on the morning of Monday, May 12, 2003, their twenty-four-year-old son, Jonathan Conway, became despondent upon learning that his three-year-old niece was coming to his mother's home to visit. Plaintiffs allege that Jonathan lived at his mother's home, had been diagnosed with a mental disorder, and had a child-like mentality. Plaintiffs allege that Jonathan became upset because he believed his mother would be distracted by his niece and would not spend time with him as planned. Plaintiffs allege that Jonathan threatened to hang himself and grabbed an electrical cord to use to carry out his threat. Plaintiffs allege that Linda Conway, Jonathan's mother, was able to retrieve the electrical cord and talked to Jonathan in his bedroom to calm him.

Plaintiffs allege that Linda Conway left Jonathan's bedroom and called her son Davis to tell him not to bring his daughter (the three-year-old niece) in that Jonathan was having a bad day. Plaintiffs allege that Davis then called 911 and reported the circumstances at the Conway home and asked for the police to

check on it, upon which Sergeant Burk and Officer Trentham responded to the Conway home. Plaintiffs allege that upon the officers' knocking upon the front door to the home, Linda Conway opened the door but did not admit the officers. Plaintiffs allege that at that time, Linda was on the telephone seeking assistance from Jonathan's doctor, Dr. Miller. Plaintiffs allege that while Linda Conway was speaking with Dr. Miller, Sergeant Burk and Officer Trentham entered the home without her permission and without a warrant.

Plaintiffs allege that while Linda continued to speak with Dr. Miller, Sergeant Burk began interrogating her regarding a threat of suicide, to which Linda responded by nodding affirmatively. Plaintiffs allege that Linda then attempted to speak with Jonathan but that he had locked himself in his bedroom, and Linda thereafter communicated with him through the locked door. Plaintiffs allege that Jonathan agreed to speak to Dr. Miller on the telephone but that the doctor was no longer on the line when Linda retrieved the telephone receiver. Plaintiffs allege that during these events, Officers Trentham and Burk became aware of Jonathan's depressed mental state and that Dr. Miller, with whom Linda had been speaking, was Jonathan's doctor. Plaintiffs further allege that Officers Trentham and Burk were aware of Jonathan's willingness to talk with Dr. Miller.

Plaintiffs allege that Jonathan informed his mother

through the locked door that he would go with the paramedics if the police would leave.  Plaintiffs allege that Linda made this known to Officers Trentham and Burk but that they refused to leave the house.  Plaintiffs allege that Linda then demanded the officers to leave the house, but that the officers continued to refuse.

Plaintiffs allege that in the meanwhile, Officers Nagle and Muehlenbeck arrived at the scene and entered the home without permission and without a warrant.  Plaintiffs allege that it was at about this time when the officers learned that Jonathan had his grandfather's old sword with him in his room.  Plaintiffs allege that Sergeant Burk then called for a "tactical strike team" after which Sergeant Johnston arrived with a riot shield and a shotgun marked "less lethal."  Plaintiffs allege that Lieutenant Barton arrived at this time as well but remained outside the home and, with the other officers, organized a plan to breach Jonathan's bedroom.  Plaintiffs allege that once organized, Officers Johnston, Trentham and Burk re-entered the home, immediately went to Jonathan's room and, without warning, smashed through Jonathan's door upon which Jonathan sought to defend himself.  Plaintiffs allege that Sergeant Johnston shot Jonathan using the less lethal shotgun and that Officers Trentham and Burk opened fire with their .40 caliber semi-automatic pistols, inflicting multiple gunshot wounds to Jonathan.  Plaintiffs allege that Jonathan was thereafter handcuffed and informed that he was under arrest for assaulting an

officer.  Plaintiffs allege that Jonathan died on May 14, 2003, as a result of his gunshot wounds.

Plaintiffs allege that no more than twenty-five minutes elapsed from the time Officers Trentham and Burk first arrived at the house to the time of the shooting.  Plaintiffs allege that at no time during this twenty-five-minute period did Jonathan threaten to harm himself or to come out of his room to harm others.  Plaintiffs allege that at no time during this twenty-five-minute period did any of the defendant officers consider peaceable means to resolve the crisis despite their knowledge of Jonathan's mental illness, the availability of Jonathan's doctor as well as other mental health specialists, and Jonathan's willingness to go with paramedics.  Finally, plaintiffs allege that at no time during this twenty-five-minute period did the officers leave the house despite Linda Conway's repeated requests and demands that they do so.

## II.  Counts of the Complaint

Counts I through VIII of the nine-count[1] Complaint are brought pursuant to 42 U.S.C. § 1983 and allege that plaintiffs' rights as protected by state and federal laws, including the Fourth, Eighth and Fourteenth Amendments to the United States

---

[1]Although the separate claims in the Complaint are numbered only through "VIII," a reading of the Complaint shows plaintiffs to have designated two of the nine claims as "Count VII."  For purposes of clarity, the Court will refer to the second designated "Count VII" as Count VIII, and to the designated "Count VIII" as Count IX.

Constitution, were violated by the various actions of the defendants in this cause, and specifically:

Count I, brought against defendants Burk, Trentham, Johnston, Nagle, Muehlenbeck, and Barton, alleges that said defendants illegally entered the Conway residence without consent, without a warrant and in the absence of exigent circumstances, and refused to leave the residence upon the demands of Linda and Jonathan Conway;

Count II, brought against defendants Burk, Trentham, Johnston, Muehlenbeck, and Barton, alleges that said defendants illegally entered Jonathan's private bedroom without consent, without a warrant, without a knock and announce of their intent to enter, without utilizing available and more peaceable means of resolution, and in the absence of exigent circumstances;

Counts III and IV, each brought against defendants Burk, Trentham, Johnston, Muehlenbeck, and Barton, allege that said defendants used excessive force in gaining entry to Jonathan's bedroom and upon Jonathan himself, respectively;

Count V, brought against defendants Burk, Barton and Johnston, alleges that said defendants failed to properly supervise the police officers and the ensuing events at the Conway home as shown by their authorization of the violent entry into Jonathan's room and the use of lethal force upon Jonathan, without considering or utilizing more peaceable means of resolution;

Count VI, brought against defendants Burk, Trentham, Muehlenbeck, Johnston, Barton, and Nagle, alleges that said defendants conspired to engage in the offending conduct as alleged in the Complaint; and

Counts VII and VIII, brought against defendant Battelle and defendant Board of Police Commissioners, respectively, each allege that said defendants failed in their duty to properly select and train police officers as to appropriate responses to crises involving mentally handicapped persons, and that such failure caused the individual police officers here to be unfit to address Jonathan's crisis, resulting in the violent assault upon and death of Jonathan Conway.

Finally, in Count IX of the Complaint, plaintiff Linda Conway brings a claim against all defendants for intentional or reckless infliction of emotional distress relating to the events and circumstances of May 12, 2003, surrounding the shooting death of her son, Jonathan.

Defendants now move for summary judgment on plaintiffs' Complaint, arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law as to plaintiffs' claims against them. Plaintiffs have responded to defendants' motion to which defendants have replied.

Pursuant to Rule 56(c), Federal Rules of Civil Procedure, a court may grant summary judgment if the information before the

court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The burden of proof is on the moving party to set forth the basis of its motion, Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. Id. The non-moving party may not rest upon its pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. Celotex, 477 U.S. at 324.

Summary judgment is a harsh remedy and should not be granted unless the movant "has established [its] right to judgment with such clarity as to leave no room for controversy." New England Mutual Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). The Eighth Circuit has noted, however, that "summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir. 1988).

### III.  Evidence Before the Court on the Motion

The evidence before the Court on the motion, viewed in a light most favorable to the plaintiffs, shows the following:  On May 12, 2003, Jonathan Conway, the twenty-four-year-old son of plaintiffs Linda Conway and Davis Michael Conway, resided at his mother's home at 65 Hillcrest Boulevard, Winchester, Missouri, which is located in St. Louis County, Missouri ("the Conway residence").  Jonathan's father, Davis Michael Conway, did not live at the Conway residence nor had any ownership interest in the residence.  Jonathan had his own bedroom at the Conway residence.  Linda collected rent from Jonathan as well as payment for utilities and food in the form of Jonathan's Supplemental Security Income checks from the Social Security Administration.

On and prior to May 12, 2003, Jonathan suffered from various mental conditions, including severe depression, agoraphobia, panic attacks, and learning disabilities.  At all times relevant to this cause, Jonathan was being treated by Dr. Miller, a psychiatrist.

During the morning of Monday, May 12, 2003, plaintiff Linda Conway informed Jonathan that his three-year-old niece, the daughter of his brother Davis, would be visiting that day, upon which Jonathan became depressed and upset inasmuch as Linda would be distracted by the young child during the day and thus would not spend time with Jonathan as planned.  Jonathan expressed to Linda

that he might as well hang himself and said that he was going to buy a rope so that he could do so. Jonathan had threatened suicide in the past, with each such threat taken seriously by Linda.[2] When Linda attempted to discourage Jonathan's thoughts of purchasing a rope, Jonathan grabbed a six-foot electrical cord indicating that he would hang himself with the cord. Linda was able to retrieve the cord from Jonathan whereupon Jonathan retreated to his bedroom which was located at the top of seven or eight steps leading to the upstairs level of Linda Conway's split-level residence. Linda followed Jonathan to his room and told him that his niece did not have to come over and that she would spend the day with him as planned.

Linda then returned downstairs and telephoned her son Davis and told him not to bring his daughter because Jonathan was having a bad day and was threatening to hang himself. Linda thereafter returned to Jonathan's room and continued to talk with Jonathan, who had calmed down but indicated that he did not feel well. Linda again telephoned her son Davis and asked that he contact his father and others so that they could call and tell Jonathan that he was loved and worthwhile. Linda had also determined to call Dr. Miller, Jonathan's treating psychiatrist.

Unknown to Linda Conway, her son Davis placed a 911

---

[2]During one previous threat, Jonathan had armed himself with a knife. With a paramedic present, Jonathan's brother Davis was able to disarm Jonathan by grabbing the knife away from him. (L. Conway Depo. at p. 36.)

emergency call to request that the police check out the situation at the Conway residence.

> 911 OPERATOR:  St. Louis County, 911.
>
> ST. LOUIS CITY:   St. Louis City with a transfer, go ahead sir.
>
> CALLER:  Thank you.  Yeah, ah, my mother just called me from 65 Hillcrest in Winchester.  Ah, says my brother's freaking out, threatening to hang himself.  You mind scooting somebody by there to check it out for me.
>
> 911 OPERATOR:  Sure, Sure, what's your cell phone number?
>
> CALLER:  My cell phone number is [***-***-****].
>
> 911 OPERATOR:  And your name?
>
> CALLER:  My name's Davis Conway.
>
> 911 OPERATOR:  Did she know that we're going to be on the way?
>
> CALLER:  Ah, I don't really know.
>
> 911 OPERATOR:  What's the phone . . .
>
> CALLER:  ah, ah,
>
> 911 OPERATOR:  . . . number at the house there?
>
> CALLER: [***-***-****].
>
> 911 OPERATOR:  How old's your brother?
>
> CALLER:  Ah, 22, I believe.
>
> 911 OPERATOR:  Okay, we'll get somebody out there.
>
> CALLER:  Thank you.

911 OPERATOR:  Thank you.

(Defts.' Exhs. A, B.)

The 911 Operator thereafter contacted emergency personnel with the 911 information obtained from Davis:

> 911 OPERATOR:  St. Louis County, it's going to be number 65 Hillcrest Boulevard.
>
> FIRE/EMS:  Hillcrest?
>
> 911 OPERATOR:  Uh huh.
>
> FIRE/EMS:  Okay, what's going on there?
>
> 911 OPERATOR:  It's going to be a violent OBS,[3] ah, suicidal subject.
>
> FIRE/EMS:  They have not attempted though?
>
> 911 OPERATOR:  Pard' me?
>
> FIRE/EMS:  They have not attempted?
>
> 911 OPERATOR:  It's unknown, it's a third party report, don't believe so.  The mother is home there, it's a ah, 29 year old male and ah, the mother called her other son saying that the 29 year old is out of control and he is threatening to hang himself.
>
> FIRE/EMS:  Okay, uhm, any weapons or anything?
>
> 911 OPERATOR:  Not that I'm aware of . . .
>
> FIRE/EMS:  Okay.

---

[3]All defendant officers understood "OBS" to mean "observation" involving a subject who is engaging in behavior considered to be out of the ordinary, possibly with mental difficulties.  The officers understood "*violent* OBS" to mean that such subject was threatening to harm himself or others.

911 OPERATOR: . . . I'm going to try calling the house here.

FIRE/EMS: Well, thanks then.

911 OPERATOR: Alright, thanks.

FIRE/EMS: Alright, thanks.

911 OPERATOR: Bye.

FIRE/EMS: Bye.

(Defts.' Exhs. A, B.)

At 10:53 a.m., emergency personnel were dispatched to the Conway residence with the following information relayed via radio and computer dispatch:

DISPATCHER: OBS.

CAR 1702: 1702

DISPATCHER: 1702, a violent OBS, ambulance also enroute to 65 Hillcrest, six five Hillcrest, and 6761 (UNCLEAR) advise when the scene is secure. It's a third party information that his mother called him and said that his 29 year old brother is out of control and threatening to hang himself. Cogis 5074, 10:53.

CAR 1702: Two's clear, enroute.

(Defts.' Exhs. A, B.)

Officer Trentham, with whom Sergeant Burk was riding, was in his police car located less than one mile from the Conway residence when the dispatch came through. Both Officers Trentham

and Burk[4] heard the dispatch via radio and saw the written display on the computer system located in the car. Officers Trentham and Burk responded to the call and traveled to the Conway residence where they arrived approximately two to three minutes after dispatch.

In the meanwhile, and prior to Officers Trentham and Burk's arrival at the Conway residence, the 911 Operator contacted Linda Conway by telephone:

> 911 OPERATOR: Hi, this is the police depart-ment.
>
> RESIDENT: Yes.
>
> 911 OPERATOR: Is everything okay there?
>
> RESIDENT: Well, yes.
>
> 911 OPERATOR: We got a call from your son Davis saying that there's, that your other sss, son, who, who's 29 is out of control.
>
> RESIDENT: Ah, well, he's calmed down now, so, uhm, we're talking.
>
> 911 OPERATOR: Was he threatening to hang himself, he said?
>
> RESIDENT: Ah, I don't know what you could do.
>
> 911 OPERATOR: Does he have, he doesn't have any weapons on him or anything does he?
>
> RESIDENT: Oh, no, huh uh.
>
> 911 OPERATOR: No.

---

[4]Regardless of rank, multiple officers will collectively be referred to herein as "officers."

RESIDENT:  No.

911 OPERATOR:  Okay.   And he hasn't tried to hurt himself at all?

RESIDENT:  No.

911 OPERATOR:  Has he tried to hurt you?

RESIDENT:  Just talk.

911 OPERATOR:  Has he tried to hurt you?

RESIDENT:  No, huh uh.

911 OPERATOR:  Okay.  We've got the police on the way out there, okay?

RESIDENT:  Well, I don't know what they could do.

911 OPERATOR:  Well, there [sic] going to have to talk to him, I mean if he's making suicidal threats, that's not good, so.

RESIDENT:  Well, I don't know what they could do.

911 OPERATOR:  Pard' me.

RESIDENT:  What could they do?

911 OPERATOR:  What can they do?

RESIDENT:  Yeah.

911 OPERATOR:  (UNCLEAR) (UNCLEAR) it's just going to depend on what those officers feel. I don't know.  The officers will evaluate the situation there and they'll talk it out with you guys and go from there.

RESIDENT:  Well . . .

911 OPERATOR:  But, but at the very least they need to make sure everybody is safe. That's the big priority here.  So they're going to come over there and make sure everything turns

- 15 -

out safely, okay?

        RESIDENT:  Okay.  Alright, thanks.

        911 OPERATOR:  You're welcome.

        RESIDENT:  Bye.

(Defts.' Exhs. A, B.)


The following information then went out by dispatch:

> DISPATCHER:  We have information now that the
> desk contacted the mother at the address and
> everything is calming down, but I'll hold the
> station until you advise . . . .  Attention
> Precincts, station be ten six for violent OBS,
> 65 Hillcrest, six five Hillcrest in
> Winchester.  10-6, 10:55.

(Defts.' Exhs. A, B.)


Neither Officer Trentham nor Sergeant Burk recall receiving this subsequent dispatch.

In the meanwhile, Linda Conway telephoned Dr. Miller and advised him that Jonathan was threatening to hang himself.  Dr. Miller instructed Linda to take Jonathan to a hospital where he could be examined by a physician.  During Linda's telephone conversation with Dr. Miller, Officers Trentham and Burk arrived at the Conway residence.  In a separate police car, Officer Nagle likewise arrived at the residence and was directed by Sergeant Burk to position himself at the rear of the house.

Officer Trentham knocked on the closed front door of the residence and received no response.  After about thirty seconds,

Officer Trentham knocked again.  Approximately fifteen to twenty seconds after this subsequent knock, Linda, with telephone in hand, opened the solid front door.  The glass storm door to the home remained closed.  Upon opening the solid door, Linda said nothing to the officers and walked away to the interior of the home. Officers Trentham and Burk observed Linda to appear excitable and fearful when she opened the door.  From outside and through the storm door, Officer Trentham observed an overturned couch in the living room and could hear a dog barking loudly from within the residence.  Linda did not return to the door.  Officer Trentham then opened the storm door and yelled to Linda to put the dog away. Linda complied and took the dog to another bedroom on the second floor of the home.  Again, Linda did not return to the door and Officers Trentham and Burk were not able to observe her whereabouts from their position outside the door.  Officers Trentham and Burk then entered the home.

Linda had returned to the kitchen and advised Dr. Miller on the telephone that the police and an ambulance were at the residence upon which Dr. Miller instructed that Jonathan go in the ambulance to the hospital where Dr. Miller would meet them.  While Linda was on the telephone with Dr. Miller, Sergeant Burk approached her and informed her that a 911 call had been placed and he began questioning her as to whether there was a threatened suicide.  In response to repeated questioning, Linda nodded in the

affirmative. Sergeant Burk responded to Linda that threatening suicide is a crime.

Subsequent to Officers Trentham and Burk's entry to the home, Officer Nagle entered the residence through the back door.

Linda thereafter went upstairs to Jonathan's room and found the door to his room closed and locked. Linda communicated to Jonathan through the locked door that the police and the paramedics were at the house upon which Jonathan told his mother to tell them to leave. When Linda relayed this to the police officers, they refused to leave. Linda then demanded the police to leave, but they continued to refuse. Linda spoke with Jonathan through the door and told him that Dr. Miller wanted Jonathan to go to the hospital, to which Jonathan responded that he would go with the paramedics if the police would leave the house. Linda informed the officers of this and then requested that they at least step outside so that Jonathan could go with the paramedics. The officers continued to refuse to leave the residence. Jonathan then indicated that he wanted to talk to Dr. Miller, but when Linda went downstairs to retrieve the telephone, Dr. Miller was no longer on the line and Linda's subsequent attempt to reach Dr. Miller at his office was unsuccessful. Linda then remained downstairs and did not return to the upstairs of the home.

Linda relayed to Officers Trentham and Burk that Jonathan had threatened to hang himself earlier in the day and that his

doctor wanted him taken to a hospital. Linda was asked by the officers if Jonathan had any weapons in his room to which she responded that he did not. Sergeant Burk requested a paramedic to speak to Jonathan, but the paramedic's attempt to persuade Jonathan to come out of his room failed. Sergeant Burk then went to Jonathan's door, identified himself and informed him that the paramedics were there to make sure he was okay. Jonathan responded that he was "fine" to which Sergeant Burk responded that they needed to be able to see him and that Jonathan needed to open the door. Jonathan refused and asked the officers to leave. Sergeant Burk stated to Jonathan that if he did not come out of the room, they would have to enter the room to make sure he was okay. Jonathan responded that if they entered the room, he would stab them. Sergeant Burk then ceased his communication with Jonathan, called for a ballistic shield and returned to the downstairs of the residence.

During Sergeant Burk's attempt to communicate with Jonathan, Linda spoke with Officer Nagle regarding the circumstances which had occurred earlier in the day and articulated that she thought Jonathan wanted to die but that he maybe wanted someone else to do it for him. When Sergeant Burk eventually returned downstairs, Officer Nagle advised him of Linda's statements.

During the course of Linda's subsequent conversations

with the officers, the officers learned that Jonathan had his grandfather's World War II sword with him in the room. Although she could not remember exactly the length of the blade, Linda indicated to the officers that she believed the sword's blade to be approximately twelve-inches in length.

Sergeant Johnston, who was located at the police station, heard the call for a ballistic shield and traveled to the Conway residence.[5] Lieutenant Barton also heard the call and separately traveled to the residence from the police station. Upon arriving, Sergeant Johnston retrieved a ballistic shield and a "less lethal" beanbag shotgun[6] from his car and went with Lieutenant Barton to the front of the Conway residence. Sergeant Burk met with Johnston and Barton outside the residence and summarized the course of events which had occurred thus far. During this debriefing, Lieutenant Barton learned that Jonathan had threatened suicide, was now locked in his room and had in his possession an edged weapon. Upon this information, a determination was made to breach Jonathan's bedroom.

Sergeants Burk and Johnston then re-entered the home whereupon Sergeant Johnston gave Officer Trentham the shield.

---

[5]It takes approximately five minutes to travel to the Conway residence from the police station in non-emergency circumstances.

[6]Pursuant to St. Louis County Police Departmental General Order 03-29, the use of a beanbag shotgun is permitted in situations when other non-lethal weapons may be ineffective or inappropriate and action must be taken immediately to resolve the situation. (Pltfs.' Exh. 8, Dep't Gen. Order 03-29, at pp. 5-6.)

Officers Johnston, Trentham and Burk traversed up the stairs and positioned themselves to enter the room as follows: Sergeant Johnston would be the first to enter with the beanbag shotgun; Officers Trentham and Burk would then enter, with Officer Trentham holding the shield. Officer Trentham understood that he would use the shield in an attempt to disarm Jonathan once he was subdued by the less lethal shotgun.[7] Officer Muehlenbeck, who had arrived at the scene earlier and entered the residence, was positioned to enter the room after Jonathan had been subdued so that he could restrain Jonathan with handcuffs. Prior to their entry to the room, both Officers Trentham and Burk drew their weapons. Lieutenant Barton never entered the Conway home.

The circumstances surrounding the period immediately preceding the officers' entry to Jonathan's room are the subject of dispute. At her deposition, Linda Conway testified that the officers breached Jonathan's room within seconds of their reentry to the home. Likewise, at their respective depositions, Ralph and Teri Cartwright, neighbors who were outside their home when Officers Johnston and Barton arrived, testified that within seconds of their observation of the police officers entering the Conway home, they heard a crash, a shotgun blast and multiple rapid-fire

---

[7]Johnston testified that it was understood that the shield was to be used against Jonathan in the event he was attempting to harm himself; it was not to be used in a defensive manner. Trentham testified that Johnston gave him the shield but did not give any specific instruction as to what to do with it.

gunshots. The officers each testified at deposition, however, that upon their reentry to the home, and for a period of time before forcibly entering Jonathan's room, verbal attempts were made to persuade Jonathan to voluntarily exit the room. Specifically, Officer Trentham testified that Sergeant Johnston was in the home for approximately five minutes prior to forcibly entering Jonathan's room and that during that period Sergeant Johnston attempted to engage Jonathan in dialogue through the door, including informing Jonathan that if he did not come out of the room, the officers would be forced to come into the room. Officer Trentham testified that Jonathan told the officers to leave, that he was fine, and that he would stab anyone who came into his room. Sergeant Burk testified that Sergeant Johnston spent a few minutes speaking to Jonathan through the closed door trying to persuade him to come out of the room. Finally, Sergeant Johnston testified that he was in the house approximately ten to fifteen minutes before the breach and that during that time he repeatedly attempted to speak with Jonathan through the locked door, but that Jonathan continually responded to him in a hostile, threatening and profane manner.[8] Sergeant Johnston testified that when Jonathan's responses to his attempted communications became less frequent, he determined it was time to breach the room. For purposes of this

---

[8]Sergeant Johnston testified that Jonathan gave responses such as, "Get the fuck out of here. If you come in here I'll kill you. Go away. I don't want to talk to you." (Johnston Depo. at p. 16.)

summary judgment motion, the Court will consider these disputed facts in a manner consistent with plaintiffs' portrayal of them.

Sergeant Johnston kicked open the door to Jonathan's room. Upon the police officers' entry, Jonathan charged at Sergeant Johnston swinging the sword in one hand and an unknown object in the other.[9] The blade of the sword was approximately three feet in length. When Jonathan was four or five feet from Sergeant Johnston, Johnston discharged the beanbag shotgun, shooting all five rounds at Jonathan. The beanbags struck but did not faze Jonathan and he continued to charge at Sergeant Johnston, swinging the sword and repeatedly striking the empty shotgun, which was being used defensively by Sergeant Johnston to prevent the sword from striking him.[10] Officers Trentham and Burk observed Jonathan to continue to charge and swing the sword. They observed Sergeant Johnston to use the shotgun in a defensive manner and heard the sound of metal upon metal. Upon these observations, Officers Trentham and Burk opened fire with their .40 caliber pistols and shot at Jonathan, ultimately disabling him. Officer Muehlenbeck then entered the room and placed handcuffs on Jonathan. From the officers' entry to Jonathan's room to the time of the shooting, only a few seconds elapsed.

---

[9]The officers learned subsequent to the shooting that the other object was the sword's empty scabbard.

[10]Sergeant Johnston characterized the scene as being in "a sword fight with an empty gun" and testified that he fended off at least ten blows from the sword. (Johnston Depo. at p. 101.)

The shooting occurred between 11:16 a.m. and 11:22 a.m. on May 12, 2003, twenty to twenty-five minutes after Officers Trentham and Burk first arrived at the Conway residence. (Defts.' Exh. B.)  At no time during this twenty-five-minute period did Officers Burk, Trentham, Muehlenbeck, Johnston, or Barton hear Jonathan threaten to harm himself.

Subsequent medical examination showed there to be ten gunshot entry wounds which were comprised of wounds to both arms, both thighs, the abdomen, lower chest, lower left flank, and upper left buttock.  (Pltfs.' Exh. 13 at pp. 7-8, 12.)[11]  It was determined that the gunshot wounds to the abdomen were the immediate cause of death.  (Id. at p. 2.)

At all times relevant to this cause, the officers of the St. Louis County Police Department had available to them the services of Behavioral Health Response (BHR), a crisis response system whose purpose was "to assist individuals experiencing a psychiatric crisis quickly access emergency mental health services[.]" (Pltfs.' Exh. 10.)  St. Louis County Police Officers were instructed by the department to use the following procedure in relation to such service:

> A.   If, in an officer's judgment, an emergency does not exist, but a citizen could benefit from the services provided by BHR, the officer should apprise the

---

[11]This same medical examination showed Jonathan to be six feet tall and to weigh 305 pounds.  (Pltfs.' Exh. 13 at p. 6.)

citizen, or family member, of the
services available from BHR and provide
them with the BHR crisis hotline numbers
. . . .

B.   A mental health professional will
determine, based upon the circumstances,
if immediate intervention is required or
if deferred treatment via referral is
indicated.

1.   If immediate intervention is
required, a mobile outreach unit of
mental health professionals will be
dispatched to the scene with arrival
usually within an hour.

2.   The telephone counselor will provide
the citizen, or family member, with
instructions for interim care
pending the arrival of the outreach
unit.

(Id.)

In responding to the circumstances at the Conway residence on May
12, 2003, none of the defendant officers considered the use of
BHR's services. Instead, Sergeant Johnston viewed the condition at
the Conway residence to be one where "[l]iterally seconds
matter[ed]," opining that "[t]ime is not always on your side when
someone is suicidal." (Johnston Depo. at p. 78.)

## IV.  Discussion

Plaintiffs bring this cause of action alleging that
defendants "showed deliberate indifference" to their rights "as
secured and protected by state and federal laws, by 42 USC Section
1983, and the Fourth, Eighth and Fourteenth Amendments to the

United States Constitution."

For liability to attach under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. <u>Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980); <u>Walker v. Reed</u>, 104 F.3d 156, 157 (8th Cir. 1997). Violations of state law do not state a claim under § 1983. <u>Doe v. Gooden</u>, 214 F.3d 952, 955 (8th Cir. 2000). As such, to the extent plaintiffs' Complaint may be construed to bring claims under § 1983 to vindicate their rights as protected by *state* law, such claims are not cognizable under § 1983 and should be dismissed.

Likewise, to the extent plaintiffs' Complaint brings claims alleging violations of the Eighth Amendment, the claims should be dismissed. The Eighth Amendment "is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions," <u>Whitley v. Albers</u>, 475 U.S. 312, 327 (1986), and is applicable "'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.'" <u>Graham v. Connor</u>, 490 U.S. 386, 398-99 (1989) (quoting <u>Ingraham v. Wright</u>, 430 U.S. 651, 671 n.40 (1977)). The undisputed evidence before the Court shows the conduct complained of here occurred prior to and during the course of the officers' seizure of Jonathan and not thereafter. Inasmuch as plaintiffs'

claims do not involve any post-conviction conduct, the Eighth Amendment is inapplicable.  _See_ Rice v. Barnes, 966 F. Supp. 877, 887 n.11 (W.D. Mo. 1997).

To the extent plaintiffs' claims of excessive use of force and illegal entry are brought under the Fourteenth Amendment, the undersigned notes that such claims are to be analyzed under the Fourth Amendment's standard of reasonableness.  The Supreme Court in Graham made "explicit . . . that _all_ claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach," Graham, 490 U.S. at 395, for it is the Fourth Amendment's prohibition against unreasonable seizures of the person which provides the primary source of constitutional protection against physically abusive governmental conduct in such seizures. Id. at 394.  Inasmuch as the Fourth Amendment also provides the primary source of constitutional protection against unreasonable intrusions into the home, plaintiffs' claims of illegal entry are likewise analyzed under the Fourth Amendment's "reasonableness" standard rather than the Fourteenth Amendment's more generalized "substantive due process" standard.  See Parker v. Clarke, 905 F. Supp. 638, 645 (E.D. Mo. 1995) (citing Graham, 490 U.S. at 395), order clarified by 910 F. Supp. 460 (E.D. Mo. 1995), rev'd in part

on other grounds sub nom. Parker v. Boyer, 93 F.3d 445 (8th Cir. 1996). Therefore, to the extent plaintiffs claim that the officers' alleged illegal entry and excessive use of force violated their Fourteenth Amendment due process rights, such claims should be dismissed.

The Court thus proceeds to address plaintiffs' § 1983 claims of excessive use of force and illegal entry under the Fourth Amendment's "reasonableness" standard.

A.    Count I – Entry to the Conway Residence

In Count I of the Complaint, plaintiffs allege that defendants Burk, Trentham, Johnston, Nagle, Muehlenbeck, and Barton entered the Conway residence on May 12, 2003, without a warrant, without permission, and in the absence of exigent circumstances, and refused to leave the premises despite Linda Conway's demands that they do so. Plaintiffs claim that such conduct rendered the officers' entry and continued presence at the residence unlawful.

The Fourth Amendment establishes the right of the people to be secure in their houses, which includes the protection against unreasonable searches and seizures thereof. U.S. Const. Amend. IV. The Supreme Court has determined that this language of the Fourth Amendment "unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Payton v. New York, 445 U.S. 573, 589–90

(1980) (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961)). It is thus well established under Fourth Amendment jurisprudence that police officers may not enter a home without a warrant unless exigent circumstances justify a warrantless entry. <u>Id.</u> at 590; <u>United States v. Ball</u>, 90 F.3d 260, 263 (8th Cir. 1996). Exigent circumstances exist, and thus a warrantless entry is justified, in emergency situations where lives are threatened. <u>Michigan v. Tyler</u>, 436 U.S. 499 (1978); <u>Ball</u>, 90 F.3d at 263.

The undisputed evidence before the Court shows the officers here to have entered the Conway residence without a warrant and without express permission by any person with authority to consent to their entry. Defendants argue in their Motion for Summary Judgment that based upon the information known by the officers at the time of their warrantless entry, exigent circumstances existed which justified immediate police action without first obtaining a warrant. For the following reasons, defendants' argument is well taken.

An officer may enter a home without first obtaining a warrant if he acts with probable cause in the presence of exigent circumstances. <u>United States v. Schmidt</u>, 403 F.3d 1009, 1013 (8th Cir. 2005); <u>Ball</u>, 90 F.3d at 263. In evaluating whether exigent circumstances justify a warrantless entry, the Court must examine the totality of the circumstances and look to what an objectively reasonable officer on the scene could have believed. <u>Ohio v.</u>

<u>Robinette</u>, 519 U.S. 33, 39 (1996) ("reasonableness" under Fourth Amendment is measured objectively by examining the totality of the circumstances); <u>Schmidt</u>, 403 F.3d at 1013. If such an officer would have had sufficient grounds to believe there was an exigency, then the Fourth Amendment does not require a warrant. <u>Schmidt</u>, 403 F.3d at 1013. Exigent circumstances exist in situations where lives are threatened. <u>Michigan v. Tyler</u>, 436 U.S. 499 (1978); <u>Ball</u>, 90 F.3d at 263; <u>United States v. Clement</u>, 854 F.2d 1116, 1119 (8th Cir. 1988).

The encounter in this case was triggered by a 911 call reporting a subject who was threatening suicide and was labeled by the police dispatcher as a "violent OBS" who was "out of control." While 911 calls, with nothing more, may not *per se* provide the exigent circumstances necessary to permit a warrantless entry, <u>see Thacker v. City of Columbus</u>, 328 F.3d 244, 253-54 & n.2 (6th Cir. 2003); <u>but see</u> <u>United States v. Cunningham</u>, 133 F.3d 1070, 1072 (8th Cir. 1998) (without discussion, Eighth Circuit notes "[t]he defendant acknowledges that the police had a right to enter the apartment to investigate the 911 call"), they nevertheless are part of the "totality of the circumstances" which the Court must examine to determine whether the officers' actions responding thereto were reasonable. Here, at the time Officers Trentham and Burk determined to enter the home, they had the following information: a 911 call had been placed regarding a violent and out of control

subject threatening suicide at the residence; an initial knock to the front door of the residence went unanswered; in response to a subsequent knock, the door was opened by a woman who was visibly shaken and who immediately retreated to the interior of the home without returning and without affirmatively responding to the officers' presence; an overturned couch in the living room was visible to the officers; and a dog was barking loudly from within the home. Under the totality of the circumstances on the information then known to the officers, an objectively reasonable officer at the scene could have believed that lives within the residence, including the suicidal subject and the distraught woman, were threatened and thus that immediate police action was necessary. See <u>Mincey v. Arizona</u>, 437 U.S. 385, 392 (1978) ("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."); <u>see also</u> <u>Russo v. City of Cincinnati</u>, 953 F.2d 1036, 1043-44 (6th Cir. 1992) (warrantless entry justified by officer's reasonable belief that resident was in danger of committing suicide); <u>Ball</u>, 90 F.3d at 263 (must view facts from standpoint of officers at the scene). In addition, given the uncertainty of the situation, and particularly, the woman's demeanor and actions in retreating from the doorway and the unknown status of the threatened suicide, it was reasonable for the officers to believe their immediate response was necessary,

with no opportunity to secure a warrant before entering the home to further investigate and/or render aid therein. See Thacker, 328 F.3d at 255.

Plaintiffs appear to argue, however, that the subsequent police dispatch that things had calmed down at the residence negated the need for immediate action thereby rendering the warrantless entry unlawful. The undersigned respectfully disagrees. Even if it could reasonably be inferred that Officers Trentham and Burk received this subsequent dispatch, they nevertheless had knowledge of the initial dispatch – received only two minutes prior – of a violent, suicidal and out of control subject whom they were unable to observe or communicate with upon their arrival at the residence. Contra Bailey v. Kennedy, 349 F.3d 731 (4th Cir. 2003) (on claim of unlawful seizure, officer's conduct after 911 report of suicidal subject unreasonable where subject was observed by police to be at his kitchen table eating lunch, no preparations for suicide attempt were observed, and subject communicated with officer and denied thoughts of suicide). Further, after a delayed response to the officers' knocking, the door to the residence was opened by a distraught woman who did not communicate to the officers but instead retreated to the interior of the home without admitting them, thereby rendering it impossible for the officers to determine whether the situation had indeed calmed and that the subject's threatened violence to himself had

passed.  Indeed, the manner in which the mother responded to the police officers' presence at the door could have led a reasonable officer to believe that the situation had not in fact calmed down as reported and, when coupled with the officers' observation of an overturned couch in the living room, a reasonable officer could have believed that violence had ensued at the home and that someone therein was in need of immediate aid.  Finally, the second dispatch that things had calmed down came only two minutes after the report of an "out of control" "violent OBS" and, as set out above, appeared to conflict with the actual occurrences observed by the officers at the scene.  Under the totality of the circumstances, exigent circumstances continued to exist, even in light of the subsequent dispatch.  The need to protect or preserve life or avoid serious injury provides exigent or emergency circumstances justifying an entry which would otherwise be illegal.  <u>Mincey</u>, 437 U.S. at 392.

On the facts known to Officers Trentham and Burk upon their warrantless entry to the Conway residence, exigent circumstances existed upon which a reasonable officer could believe that lives were threatened and that immediate action was necessary. Such entry was therefore lawful.  Inasmuch as Officers Trentham and Burk's entry to the residence was lawful, the subsequent entries to the residence by the other officers were likewise lawful inasmuch as the undisputed evidence shows the scope of their intrusion not

to have exceeded the scope of the initial entry, that is, to investigate and secure the safety of the residents therein. United States v. Brand, 556 F.2d 1312, 1317-18 & n.9 (5th Cir. 1977) (additional investigators or officials may enter a citizen's property after one official has already intruded legally, but such later officials must confine their intrusion to the scope of the original invasion).[12] At the time the mother asked the police officers to leave the home, the exigent circumstances had not abated, and indeed, the safety and security of Jonathan became even more paramount inasmuch as this suicidal subject had now locked himself in his room and was inaccessible to the officers or any other person.[13] Being lawfully in the residence in the first instance, it was not unreasonable for the officers to remain there given this circumstance of continuing danger to Jonathan. Cf. United States v. Boettger, 71 F.3d 1410, 1414 (8th Cir. 1995) (the need to protect public safety by detecting "continuing danger" is

---

[12]In Brand, the Fifth Circuit held that "[l]ater arrivals may join their colleagues *even though the exigent circumstances justifying the initial entry no longer exist.*" Brand, 556 F.2d at 1317 (emphasis added). It cannot be said in the circumstances here, however, that exigent circumstances no longer existed at the time of the officers' subsequent entries. The perceived danger to Jonathan did not lessen by the mere passage of time and indeed, became more tangible given the information obtained subsequent to the initial lawful entry and, specifically, that Jonathan had locked himself in his room and would not exit at the requests of paramedics and police officers; that he had a weapon in his possession; and that he had expressed a desire to kill himself that morning and temporarily secured the means by which to do so.

[13]See supra note 12.

an exigent circumstance justifying officers to remain on the scene). Therefore, it was reasonable for the officers not to accede to the mother's request to leave.

Accordingly, for all of the foregoing reasons, defendants Burk, Trentham, Johnston, Nagle, Muehlenbeck, and Barton[14] are entitled to judgment as a matter of law on plaintiffs' claims raised in Count I of their Complaint that their entry to the Conway residence and subsequent refusal to leave, violated plaintiffs' Fourth Amendment rights.

B.   Counts II, III – Entry to Jonathan's Room

In Count II of the Complaint, plaintiffs allege that defendants Burk, Trentham, Barton, Johnston, and Muehlenbeck unlawfully entered Jonathan's room at the Conway residence on May 12, 2003, inasmuch as such entry was without a warrant, without permission, in the absence of exigent circumstances, and without a knock and announce of their intent to enter.   In Count III, plaintiffs allege that such defendants' violent entry into Jonathan's bedroom constituted excessive force.[15]   As argued in

_____

[14]Although the undisputed evidence before the Court shows Lieutenant Barton never to have entered the Conway residence, plaintiffs nevertheless allege that she directly participated in the alleged unlawful entry by ordering other officers to enter for the purpose of breaching Jonathan's room.

[15]Defendants contend, and plaintiffs agree, that these two counts of the Complaint should be considered together inasmuch as they challenge the lawfulness of the entry into Jonathan's room. Indeed, to the extent plaintiffs claim in Count III that the manner and method by which the defendants entered the room constituted excessive use of force, the undersigned is unaware of any Eighth

support of their Motion for Summary Judgment as to Count I, defendants contend that exigent circumstances existed to justify the officers' immediate entry to the bedroom. For the following reasons, defendants' argument is well taken.

At the time they breached Jonathan's bedroom door, the officers had the following information: Jonathan had threatened suicide earlier that morning and, at that time, had identified and obtained the means by which to do so, that is, an electrical cord, which was later retrieved by his mother; Jonathan had locked himself in his room and refused to voluntarily exit the room despite repeated requests by his mother, the paramedics and police officers that he do so; Jonathan was presently armed with a sword inside the room; and Jonathan had become in an agitated state, threatening to stab the officers if they entered the room. At the time of entry, Sergeant Johnston also believed that a hanging could result in death within three to five minutes and that a cut to a major artery could result in death within ninety seconds. Taken together, these facts could lead a reasonable officer to believe that Jonathan was in danger of committing suicide, and thus that immediate entry to the room was necessary. <u>Russo</u>, 953 F.2d at 1043 (officer understood that subject was mentally disturbed, had two

---

Circuit or Supreme Court authority, and plaintiffs cite to none, which supports a claim that the degree of force used to gain entry to a dwelling, rather than in the seizure of a person, may give rise to a independent claim under the Fourth Amendment for excessive use of force.

large knives in his possession, that the police transmission had described him as suicidal, and that immediately before the officer's forcible entry the subject fell silent and turned out the lights).  The fact that not every entering officer personally witnessed each of these individual factors which contributed to the decision to enter the room is of no instance.  Law enforcement officers may act on information provided by others in law enforcement as long as their reliance on such information is reasonable.  Doran v. Eckhold, 409 F.3d 958, 965 (8th Cir. 2005) (en banc) (citing United States v. Hensley, 469 U.S. 221, 232 (1985); Baker v. McCollan, 443 U.S. 137, 145-46 (1979); Brown v. Nutsch, 619 F.2d 758, 764-65 (8th Cir. 1980)).  Here, to the extent certain officers may not have personally witnessed all factors leading to the decision to breach Jonathan's room, the undisputed evidence before the Court shows the officers to have nevertheless become aware of such circumstances through reports from other officers with firsthand knowledge, such as Sergeant Burk, which included information that the suicidal subject had locked himself in his room and was presently armed with an edged weapon.  Nothing before the Court shows the officers' reliance on this information to be unreasonable and indeed, given the correctness of such information, such reliance was reasonable.  See Ball, 90 F.3d at 263.  Further, once the determination had been made that the circumstances necessitated an immediate breach into the room, none

of the breaching officers had a constitutional duty to verify for themselves the existence of exigent circumstances before carrying out their assignment.  <u>Doran</u>, 409 F.3d at 965.

To the extent plaintiffs claim and the evidence shows that the officers' entry into Jonathan's room was immediate upon their reentry to the home and not after additional attempts were made to persuade Jonathan to voluntarily come out of his room, the evidence nevertheless shows there to have existed exigent circumstances justifying the immediate breach into Jonathan's room, including Jonathan's possession of a sword, his previous threat to kill himself, and the swiftness with which death could occur if a suicide attempt were made.  Given the exigency of the circum-stances, coupled with Jonathan's current threat to harm any entering officers, the officers' unannounced entry to Jonathan's room was likewise reasonable.  <u>See</u> <u>Doran</u>, 409 F.3d at 962 (threat of physical violence justifies unannounced entry) (citing <u>Wilson v. Arkansas</u>, 514 U.S. 927, 935-36 (1995)).

Therefore, for all of the foregoing reasons, defendants Burk, Trentham, Barton,[16] Johnston, and Muehlenbeck are entitled to judgment as a matter of law on plaintiffs' claims in Counts II and III of their Complaint that said officers' entry into Jonathan's

---

[16]Although the undisputed evidence before the Court shows Lieutenant Barton never to have entered Jonathan's room, plaintiffs nevertheless allege that she directly participated in the alleged unlawful entry by ordering the other officers to breach the room.

bedroom was unlawful.[17]

C.    Count IV – Use of Force in Seizure of Jonathan

In Count IV, plaintiffs claim that defendants Burk, Trentham, Barton, Johnston, and Muehlenbeck used excessive force in their seizure of Jonathan, and more particularly, by using deadly force.  In their Motion for Summary Judgment, defendants argue that their use of force was reasonable in the circumstances and thus not violative of the Fourth Amendment.

All claims that a law enforcement officer has used excessive force during a seizure are analyzed under the Fourth Amendment.  Graham, 490 U.S. at 395.  The standard is whether the officer's actions were reasonable "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 396.  This is a test of objective reasonableness, to be determined without regard to the officer's subjective intent or motivation.  Id. at 397.  Objective reasonableness is evaluated with "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate

---

[17]The undersigned notes that in their Response to Defendants' Motion for Summary Judgment, plaintiffs appear to argue that Officer Nagle should be liable for the alleged unlawful breach of Jonathan's bedroom inasmuch as he "stood by while all this occurred[.]" (Pltfs.' Resp. at p. 28.) A review of the Complaint shows the claims raised in Counts II and III not to have been brought against Officer Nagle.  As such, the Court declines to discuss whether, and to what extent, Officer Nagle had a duty to intervene in the other officers' conduct.

threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The analysis must recognize that police "are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397.

To determine whether an officer's conduct in effectuating a seizure was reasonable, the Court must first determine when the seizure occurred. Only then can the reasonableness of the officer's conduct be ascertained. "A seizure occurs only when a citizen is physically touched by a law enforcement officer or where he otherwise submits to a show of authority by the officer." California v. Hodari D., 499 U.S. 621, 626 (1991); see also Mettler v. Whitledge, 165 F.3d 1197, 1203-04 (8th Cir. 1999); Schulz v. Long, 44 F.3d 643, 647 (8th Cir. 1995). "An assertion of authority by a law enforcement officer without a corresponding submission by the citizen does not constitute a seizure within the meaning of the Fourth Amendment." Schulz, 44 F.3d at 647 (citing Hodari D., 499 U.S. at 626). A "physical touch," and thus a seizure, includes those circumstances when an officer applies physical force to restrain a person's movement, even when it is ultimately unsuccessful. Hodari D., 499 U.S. at 624-26. Where a citizen is neither touched by an officer nor submits to that officer's

authority, no seizure by that officer has occurred. <u>Schulz</u>, 44 F.3d at 647; <u>Cole v. Bone</u>, 993 F.2d 1328, 1333 (8th Cir. 1993).

In this cause, the officers' mere assertion of authority in ordering Jonathan to come out of his room and in their entry to the room does not constitute a seizure – the undisputed evidence shows Jonathan not to have submitted to the officers' demands nor to have been physically touched upon the officers' initial entry to the room. <u>See</u> <u>Mettler</u>, 165 F.3d at 1204. Sergeant Johnston's striking of Jonathan with the beanbags shot from the non-lethal shotgun, however, constituted a seizure by him even though such physical force failed to subdue Jonathan. <u>Hodari D.</u>, 499 U.S. at 624-26. This application of physical force was reasonable. At the time Sergeant Johnston discharged the shotgun, Jonathan was approximately four or five feet from Sergeant Johnston and was charging at him swinging a sword with a blade three feet in length. Sergeant Johnston was aware that Jonathan had threatened to stab anyone entering the room and that he had previously threatened to take his own life. In such circumstances, an objectively reasonable officer could have believed that his life was in danger or that Jonathan was a significant danger to himself. <u>Graham</u>, 490 U.S. at 396. To use non-lethal force by discharging beanbags in an effort to subdue Jonathan in such violent circumstances was reasonable. <u>E.g.</u>, <u>Winters v. Adams</u>, 254 F.3d 758, 765 (8th Cir. 2001). As such, Sergeant Johnston is entitled to judgment as a

matter of law to the extent plaintiffs' claim can be construed to allege that he used excessive force in the discharge of the beanbag shotgun. Because no other defendant used the beanbag shotgun in an attempt to subdue Jonathan and thus did not seize Jonathan by such method, they are entitled to summary judgment on such a claim. Schulz, 44 F.3d at 647; Cole, 993 F.2d at 1333.

The gravamen of plaintiffs' claim of excessive use of force, however, is the officers' use of deadly force in the shooting of Jonathan with lethal weapons. "[I]t is an unavoidable understatement to observe that the shooting was a seizure." Gardner v. Buerger, 82 F.3d 248, 251 (8th Cir. 1996). A seizure by shooting is objectively reasonable, however, when the officer using the force has probable cause to believe that the subject poses a significant threat of death or serious physical injury to the officer or others. Tennessee v. Garner, 471 U.S. 1, 3, 11 (1985); Gardner, 82 F.3d at 252. The Court's analysis must focus on the reasonableness of the seizure itself, that is, the shooting, and not on the events leading up to it. Gardner, 82 F.3d at 252; Schulz, 44 F.3d at 648; Cole, 993 F.2d at 1333.

In Garner, the Supreme Court held that an officer may reasonably use deadly force if the officer has probable cause to believe that the subject poses a significant threat of death or serious physical injury to the officer or others. Garner, 471 U.S. at 3, 11; see also Gardner, 82 F.3d at 252; Schulz, 44 F.3d at 649;

<u>Cole</u>, 993 F.2d at 1333. Applying this standard to the circumstances of the instant cause, Officers Trentham's and Burk's decision to use deadly force to subdue Jonathan was objectively reasonable. The undisputed evidence before the Court shows that at the time Officers Trentham and Burk discharged their weapons, they knew that Sergeant Johnston had emptied the beanbag shotgun in his attempt to use non-lethal force to subdue Jonathan; that Jonathan was continuing to charge at Sergeant Johnston, swinging a three-foot sword and striking the barrel of the shotgun being held by Sergeant Johnston; that Sergeant Johnston had nothing with which to defend himself other than the barrel of the empty shotgun; and that previous attempts to subdue Jonathan, whether by verbal instruction or through the use of the beanbag shotgun, were unsuccessful. In these rapidly evolving circumstances, a reasonable officer on the scene would have probable cause to believe that Jonathan posed an immediate and significant threat of death or serious physical harm to Sergeant Johnston, thereby justifying the use of deadly force upon Jonathan. <u>Garner</u>, 471 U.S. at 11; <u>see also</u> <u>Schulz</u>, 44 F.3d at 650 (affirming jury's verdict that officer committed no Fourth Amendment violation in using deadly force against agitated subject who was approaching officer's defenseless partner with a raised double-bladed ax); <u>Cole</u>, 993 F.2d at 1333 (factors considered in determining reasonableness of deadly force included officer's knowledge that subject showed no signs of stopping his aggressive

and potentially deadly behavior and that other means to stop the subject had failed).  It cannot be said, therefore, that Officers Trentham's and Burk's use of deadly force in the face of such circumstances was constitutionally unreasonable.  Officer Trentham and Sergeant Burk are therefore entitled to judgment as a matter of law on plaintiffs' claim of excessive use of force in the use of deadly force upon Jonathan.  Inasmuch as no other defendant employed the use of deadly force to subdue Jonathan and thus did not seize Jonathan by such method, they are entitled to summary judgment on such a claim.  <u>Schulz</u>, 44 F.3d at 647; <u>Cole</u>, 993 F.2d at 1333.

D.    <u>Liability for Events Preceding Seizure</u>

        Throughout their Complaint, plaintiffs claim that the defendants should have, but failed to employ less confrontational and less lethal means to decelerate the situation at the Conway residence.  Specifically, plaintiffs contend that prior to the seizure of Jonathan, the defendants should have attempted to peaceably negotiate Jonathan's exit from his room by engaging either 1) the professional services of Behavioral Health Resources, an entity whose services were available to the St. Louis County Police in mental health crises; or 2) the services of negotiators employed by St. Louis County Police, <u>e.g.</u>, hostage negotiators. Plaintiffs claim that the defendant-officers' continued presence at the Conway residence and confrontational approach to Jonathan's

crisis without employing these more peaceable means resulted in the violent entry to Jonathan's room and deadly seizure of Jonathan's person.[18]   Plaintiffs also claim that during the course of the seizure itself, the defendants should have employed other less lethal means such as mace or the use of batons, or should have considered retreating from the room which would have thereby negated the need for deadly force.   For the following reasons, plaintiffs' argument must fail.

In determining the reasonableness of a seizure, the Court must focus on the seizure itself and not on the events leading up to it.  Gardner, 82 F.3d at 252.

> The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within a range of conduct which is objectively "reasonable" under the Fourth Amendment. Alternative measures which 20/20 hindsight reveal to be less intrusive (or more prudent), such as waiting for a supervisor or the SWAT team, are simply not relevant to the reasonableness inquiry.

Schulz, 44 F.3d at 649.

Plaintiffs argue that the officers' conduct escalated the events at the Conway residence and thus caused the circumstances which led to the need to use deadly force upon Jonathan.

_____

[18]As discussed supra, however, the entry to Jonathan's room and the seizure of Jonathan's person were constitutionally reasonable.

Plaintiffs contend that the violent seizure itself would not have occurred but for such conduct. Addressing this same argument in Schulz v. Long, however, the Eighth Circuit determined that an allegation that the officers "created the need to use force by their actions prior to the moment of seizure is irrelevant" to the issue as to whether the officers' use of deadly force was reasonable in effectuating the seizure. 44 F.3d at 648-49. In reaching this conclusion, the Eighth Circuit relied on the Supreme Court's discussion in Graham v. Conner, wherein the Supreme Court stated:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer *on the scene*, rather than with the 20/20 vision of hindsight. . . . With respect to a claim of excessive force, the [] standard of reasonableness *at the moment* applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make *split-second judgments*--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

Schulz, 44 F.3d at 648 (quoting Graham, 490 U.S. at 396-97) (quotation marks omitted) (emphasis in Schulz).

In Cole v. Bone, the Eighth Circuit reasoned that because the Fourth Amendment prohibits unreasonable *seizures*, and that a seizure occurs only when the pursued subject is physically touched

by the police or submits to a show of authority by the police, the events leading up to such physical contact or submission are not subject to Fourth Amendment scrutiny.  993 F.2d at 1332-33.  "The Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general.  Consequently, we scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." Id. at 1333 (citations omitted).

As discussed supra, in the totality of the circumstances in the instant cause and on the information then known to them, the officers' warrantless entry to the Conway residence and continued presence therein was reasonable.  The officers' entry to Jonathan's bedroom was likewise reasonable in the circumstances.  During this period prior to the seizure of Jonathan, the officers engaged in no unreasonable and/or unlawful conduct.  Supreme Court and Eighth Circuit precedents compel this Court to conclude that even if arguably there were alternative, less intrusive and more peaceable means which might have been used in the attempt to secure the safety of Jonathan and others in the residence, that is not a factor to be considered in determining the reasonableness of the officers' actual conduct. Schulz, 44 F.3d at 649.

Likewise, the officers' actual conduct in effectuating the seizure(s) of Jonathan was reasonable, including the ultimate use of deadly force.  In the totality of the circumstances, it was

objectively reasonable for Officers Trentham and Burk to believe that Jonathan posed a significant threat of physical harm to Sergeant Johnston, including death. The use of deadly force was thus objectively reasonable in this cause, without regard to what *could* have been done in the alternative. <u>Schulz</u>, 44 F.3d at 649.

The Fourth Amendment prohibits courts from acting as a "Monday morning quarterback" in reviewing whether police officers should have responded to an incident in a different manner or whether the officers should have used a lesser degree of force. <u>Schulz</u>, 44 F.3d at 649. The significance of cautioning against such hindsight review, placed in the particular context of the circumstances of this case, was well articulated from the perspective of an officer who was actually on the scene:

> [I]t sounds good after the fact to say, well, you've got BHR, you've got tac. Time is not always on your side when someone is suicidal.
>
> Literally seconds matter. Like I said, if a person decides to hang himself, he'll be dead in three to five minutes. If he cuts a major artery, he'll be dead in 90 seconds.
>
> You don't always have the luxury of kicking back and just waiting for things to fall into place. You have to assess each individual situation, and sometimes it's necessary to take immediate action.

(Johnston Depo. at p. 78.)

Accordingly, the defendants' alleged failure to employ less confrontational and less lethal means to resolve the

- 48 -

escalating conflict at the Conway residence on May 12, 2003, is of no instance in determining whether the defendants' actions in entering the residence and in effectuating the seizure of Jonathan's person were objectively reasonable in the circumstances.

E.   Qualified Immunity

In their Motion for Summary Judgment, defendants contend that in the event their conduct was found to be unreasonable and thus violative of the Fourth Amendment, they nevertheless are entitled to qualified immunity on plaintiffs' claims.   For the following reasons, defendants' argument is well taken.

Qualified immunity protects state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   A defense of qualified immunity requires the Court to determine, first, whether the facts as alleged show a violation of a constitutional right; and second, whether such constitutional right was clearly established at the time of the alleged violation such that a reasonable officer would understand that his conduct violates that right.   Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).   If such facts would not amount to a constitutional violation, the inquiry ends.   McVay ex rel. Estate of McVay v. Sisters of Mercy Health Sys., 399 F.3d 904, 908 (8th Cir. 2005).

As set out above, the officers' entry to the Conway residence and to Jonathan's bedroom was objectively reasonable given the exigency of the circumstances, and namely, the threat of immediate harm to persons located therein. Likewise, the officers' use of deadly force upon Jonathan was objectively reasonable given the immediate and significant threat of deadly harm posed by Jonathan to Sergeant Johnston. As such, the defendant-officers' use of force and warrantless entries to the Conway residence and into Jonathan's bedroom were lawful under the Fourth Amendment and do not amount to a constitutional violation. Because the facts do not establish a constitutional violation, the qualified immunity inquiry ends and the defendants are entitled to summary judgment. McVay, 399 F.3d at 909.

Assuming arguendo, however, that a Fourth Amendment violation has been established by the officers' conduct under the circumstances, it cannot be said that the officers reasonably should have known that what they were doing violated any clearly established constitutional right. "A right is clearly established when that right is so clear that a reasonable official would understand that what he is doing violates that right." Craighead, 399 F.3d at 962 (citing Saucier, 533 U.S. at 202).

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity

> unless the very action in question has
> previously been held unlawful . . . but it is
> to say that in the light of pre-existing law
> the unlawfulness must be apparent.

<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).

With respect to the officers' warrantless entry to the Conway residence, it cannot be said that the defendant-officers reasonably should have known that what they were doing violated the Fourth Amendment. At the time of the officers' entry to the Conway residence, the law was clearly established that the Fourth Amendment prohibits a warrantless entry into the home absent exigent circumstances. See <u>Rogers v. Carter</u>, 133 F.3d 1114, 1119 (8th Cir. 1998). Qualified immunity attaches, however, where officers entering without a warrant reasonably, but mistakenly, conclude on information then known to them that exigent circumstances exist to justify their warrantless entry. <u>Id.</u>; <u>see also</u> <u>Anderson</u>, 483 U.S. at 640-41; <u>cf.</u> <u>Parks v. Pomeroy</u>, 387 F.3d 949, 957 (8th Cir. 2004) (officer entitled to qualified immunity even if he wrongly, but reasonably, believed his actions were lawful). As set out above, the officers here had information that a 911 emergency telephone call had been made reporting there to be a violent, suicidal subject within the residence; there was a delayed response to the officers' attempt to contact persons within the residence, after which the door to the home was opened by a distraught woman who did not communicate to the officers but

instead retreated to the interior of the home; the officers observed an overturned couch in the living room; and from their position outside the glass-paned door, the officers were unable to discern the whereabouts of the distraught woman or of the reportedly suicidal subject. In light of these circumstances, it cannot be said that a reasonable officer would have known that a warrantless entry to the residence violated plaintiffs' clearly established right to be free from such entry, especially where warrantless entries are justified in circumstances where lives are threatened. Michigan v. Tyler, 436 U.S. 499 (1978). Although plaintiffs claim that at the time of the officers' entry to the home, Jonathan was calmly resting in his bedroom, Linda's retreat within the home was for her to continue her telephone conversation with Dr. Miller, and that the disarray in the living room was in relation to preparation for an upcoming garage sale, nothing before the Court shows that the officers had this information at the time they entered the home. As such, even though exigent circumstances may not, in fact, have existed on the facts as alleged by plaintiffs, the officers here were nevertheless reasonable in their belief that lives may have been threatened within the home, thereby warranting an immediate and warrantless entry. Accordingly, the defendant-officers are entitled to qualified immunity on plaintiffs' claim of unlawful entry to the Conway residence. See Saucier, 533 U.S. at 205-06 (officer does not lose qualified

immunity because of a mistaken, yet reasonable belief); <u>Parks</u>, 387 F.3d at 957.

Likewise, with respect to the officers' entry to Jonathan's bedroom, it cannot be said that at the time of their entry, the defendant-officers reasonably should have known that what they were doing violated the Fourth Amendment. As set out above, at the time Jonathan's bedroom door was breached, the officers had information that Jonathan had earlier threatened suicide and had obtained the means by which to do so; that Jonathan had locked himself in his room and refused to voluntarily exit the room despite repeated requests by his mother, the paramedics and police officers; that Jonathan was presently armed with a sword inside the room; and Jonathan had become in an agitated state, threatening to stab the officers if they entered the room. In light of these circumstances, it cannot be said that a reasonable officer would have known that an immediate, warrantless breach into Jonathan's room violated plaintiffs' clearly established right to be free from such entry, especially where such entries are justified in circumstances where lives are threatened. <u>Michigan v. Tyler</u>, 436 U.S. 499 (1978). This is especially true here, where Sergeant Johnston was of the belief that death could occur within a matter of seconds or minutes if an attempted suicide were made. Although plaintiffs claim that Jonathan made no threats to harm himself while the officers were in the home and had not threatened

to exit the room for the purpose of doing harm to others, the officers nevertheless had information that Jonathan had previously threatened suicide, was armed with an edged weapon, was uncooperative and had become agitated, and had made himself inaccessible to the officers or any other person. On these objective facts, the officers were reasonable in their belief that Jonathan was in danger of harming himself within that locked room, thereby warranting an immediate and warrantless entry to the room. Accordingly, the defendant-officers are entitled to qualified immunity on plaintiffs' claim of unlawful entry to Jonathan's bedroom. See Saucier, 533 U.S. at 205-06; Parks, 387 F.3d at 957.

Finally, with respect to the officers' use of deadly force upon Jonathan, it cannot be said that at the moment of the shooting, Officers Trentham and Burk reasonably should have known that what they were doing violated the Fourth Amendment. At the time of the use of force in this cause, there was no clearly established right that an officer may not use deadly force in the seizure of a citizen in response to such citizen's use of deadly force upon the police authority. See Mettler, 165 F.3d at 1203. The undisputed evidence shows Jonathan to have been charging at Sergeant Johnston while swinging a sword with a three-foot blade and repeatedly striking the empty shotgun being held and used by Sergeant Johnston to defend himself from Jonathan's attack. Jonathan's aggression toward Sergeant Johnston was intense and

unabated, the circumstances were extremely volatile and potentially deadly, and the events were evolving rapidly. The Eighth Circuit has found that, given the state of the law, an officer's use of deadly force in such circumstances does not violate a clearly established constitutional right and thus that such an officer is protected by qualified immunity. <u>Parks</u>, 387 F.3d at 957-58; <u>see also</u> <u>Mettler</u>, 165 F.3d at 1203; <u>Nelson v. County of Wright</u>, 162 F.3d 986, 990-91 (8th Cir. 1998). The fact that Officers Trentham and Burk had their weapons drawn when they entered the room does not change this result. <u>See</u> <u>McCoy v. City of Monticello</u>, 342 F.3d 842, 848-49 (8th Cir. 2003). At the time they prepared to enter the room, the officers were aware that Jonathan was in an agitated state, was armed with an edged weapon, and was threatening to harm anyone who entered. On the totality of the circumstances, it cannot be said that the officers' act of drawing their weapons prior to entering such a known volatile environment was objectively unreasonable. <u>Cf.</u> <u>id.</u> at 849.

Accordingly, for all of the foregoing reasons, defendants are entitled to qualified immunity on plaintiffs' claims that the officers' entry into the Conway residence and subsequent entry into Jonathan's bedroom, and in the use of deadly force upon Jonathan, violated their constitutional rights.

F.    <u>Count V – Supervisory Liability</u>

To the extent plaintiffs claim in Count V, and indeed

throughout their Complaint, that defendants Barton, Burk and Johnston are liable in their supervisory capacity by authorizing the violent entry into Jonathan's bedroom and the use of deadly force upon Jonathan, and by failing to use more peaceable means of resolution, such claims must fail. Where, as here, a plaintiff has failed to establish that constitutional rights were violated, "they have no section 1983 claim against those defendants sued as supervisors." Cole, 993 F.2d at 1334. Because it has been determined that no Fourth Amendment violation occurred in the manner and method of entry into Jonathan's bedroom and in the use of force upon Jonathan, the defendants named as supervisors over such conduct must be granted summary judgment on such claims. Id.

G.   Count VI – Conspiracy

In Count VI, plaintiffs claim that Officers Burk, Trentham, Muehlenbeck, Johnston, Barton, and Nagle conspired to engage in the offending conduct as alleged in the Complaint.

A party may not recover on a § 1983 claim of conspiracy for deprivation of civil rights unless the party establishes a right to recover on the underlying civil rights action. West v. Carson, 49 F.3d 433, 436 (8th Cir. 1995). A determination that defendants did not deprive plaintiffs of their civil rights precludes recovery for conspiracy to deprive plaintiffs of those same rights. Id. Because the undisputed evidence before the Court shows defendants' conduct not to have violated plaintiffs'

constitutional rights as alleged, plaintiffs' § 1983 claim of conspiracy to deprive them of such rights must fail. Id.; Ivester v. Lee, 991 F. Supp. 1113, 1124 (E.D. Mo. 1998). Defendants are therefore entitled to judgment as a matter of law as to Count VI of plaintiffs' Complaint.

## H. Counts VII and VIII - Municipal Liability

Plaintiffs claim that Superintendent Battelle and the Board of Police Commissioners failed in their duty to properly select and train police officers as to appropriate responses to crises involving mentally handicapped persons, and that such failure caused the individual police officers here to be unfit to address Jonathan's crisis, resulting in the violent assault upon and death to Jonathan Conway.

As Superintendent of Police and as members of the Board of Police Commissioners, these defendants cannot be liable under 42 U.S.C. § 1983 merely because a subordinate violated an individual's constitutional rights. See City of Canton v. Harris, 489 U.S. 378, 385 (1989). Instead, liability can attach to said defendants in such circumstances only "if [they] directly participated in the constitutional violation, or if [their] failure to train or supervise the offending actor caused the deprivation." Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997); see also Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 694 (1978). In the instant cause, plaintiffs do not allege that these defendants

actually participated in the events which occurred at the Conway residence on May 12, 2003, which ultimately culminated in Jonathan's death. As such, plaintiffs must demonstrate that the defendants' customs or policies or failure to train or supervise caused a deprivation of their constitutional rights.

In the Eighth Circuit, a party is unable to prevail on such theories unless an underlying violation of the Constitution is established. Schulz, 44 F.3d at 650; see also Brodnicki v. City of Omaha, 75 F.3d 1261, 1266 (8th Cir. 1996) (claims against the city for inadequate training or municipal custom lack merit where police officers did not violate plaintiffs' constitutional rights). Given the Court's disposition of plaintiffs' constitutional claims, and specifically, that no Fourth Amendment violation occurred in the manner and method of entry to the Conway residence or to Jonathan's bedroom, and that no Fourth Amendment violation occurred in the use of force upon Jonathan, there exists no constitutional injury upon which the plaintiffs may premise their claim of failure to train. Schulz, 44 F.3d at 650. Consequently, Superintendent Battelle and the Board of Police Commissioners cannot be liable to plaintiffs under § 1983 and are thus entitled to judgment as a matter of law on Counts VII and VIII of plaintiffs' Complaint. Id.; see also Neal v. St. Louis County, 52 F. Supp. 2d 1090, 1096 (E.D. Mo. 1999), aff'd, 217 F.3d 955 (8th Cir. 2000).

I.   <u>Count IX – Infliction of Emotional Distress</u>

    In Count IX, plaintiff Linda Conway brings a claim against all defendants for intentional or reckless infliction of emotional distress relating to the events and circumstances of May 12, 2003, surrounding the shooting death of her son, Jonathan. Although plaintiff does not invoke the protections of the United States Constitution within this claim, she nevertheless asserts in response to defendants' Motion for Summary Judgment that the claim is brought pursuant to 42 U.S.C. § 1983.

    Plaintiff concedes that the tort of intentional and/or reckless infliction of emotional distress is a common law claim actionable under Missouri state law. Plaintiff argues, however, that defendants are nevertheless liable under 42 U.S.C. § 1983 inasmuch as they were acting under color of state law when they allegedly committed such tort against her. (Pltfs.' Resp. to Defts.' Mot. Summ. Judg. at pp. 39-40.) Plaintiff's argument is misplaced. As discussed _supra_, for liability to attach under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States. _Gomez_, 446 U.S. at 640; _Walker_, 104 F.3d at 157. Violations of state law do not state a claim under § 1983. _Doe_, 214 F.3d at 955. Accordingly, to the extent plaintiff Linda Conway seeks to recover under 42 U.S.C. § 1983 for defendants' alleged violation of Missouri state law for the intentional and/or reckless infliction of emotional distress,

such a claim is not cognizable and should be dismissed.

J.    Remaining State Law Claims

        Inasmuch as the Court will dismiss all claims over which
it has original jurisdiction, the undersigned declines to exercise
supplemental jurisdiction over plaintiffs' remaining state law
claims.    28 U.S.C. § 1367(c)(3); see also Anderson v. Franklin
County, Mo., 192 F.3d 1125, 1131 (8th Cir. 1999); American Civil
Liberties Union v. City of Florissant, 186 F.3d 1095, 1098-99 (8th
Cir. 1999) (when state and federal claims are joined and all
federal claims are dismissed on a motion for summary judgment,
state claims are ordinarily dismissed without prejudice); Willman
v. Heartland Hosp. East, 34 F.3d 605, 613-14 (8th Cir. 1994)
(same), cert. denied, 514 U.S. 1018 (1995).[19]

## V.  Conclusion

        The events which occurred at the Conway residence on May
12, 2003, were undeniably tragic.  However, not every tragic event
gives rise to § 1983 liability against a municipality or its
officers.  The police are held to standards of reasonableness, not
standards of perfection.  While it does not lessen the pain of
plaintiffs' loss, the actions of the police officers here were
objectively reasonable under the totality of the circumstances.  As
such, no Fourth Amendment violation occurred by their conduct.

─────────────

        [19]Plaintiffs, of course, are free to pursue these claims in an
appropriate state court if they so choose.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that defendants' Joint Motion for Summary Judgment (Docket No. 24) is **GRANTED** to the extent plaintiffs seek relief under 42 U.S.C. § 1983 for alleged violations of their constitutional rights.

**IT IS FURTHER ORDERED** that to the extent plaintiffs seek relief under 42 U.S.C. § 1983 for alleged violations of state law, such claims are dismissed with prejudice for failure to state a claim.

**IT IS FURTHER ORDERED** that to the extent plaintiffs' Complaint raises independent and supplemental claims of alleged violations of state law, such claims are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

**IT IS FURTHER ORDERED** that all motions which remain pending in this cause are denied as moot.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this _30th_ day of March, 2006.